# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:08-cr-07 |
| | ) | |
| CHARLES J. GOOCH, JR. and | ) | JUDGE KIM R. GIBSON |
| STERLING YAZMIN LONG-PAYTON, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER OF COURT

### I.    SYNOPSIS

This matter comes before the Court on Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence Obtained as a Result of an Unlawful Search and Seizure with Accompanying Citation of Authority (hereinafter Defendant Payton's "Motion to Suppress") (Doc. No. 28) and Defendant Charles J. Gooch, Jr.'s Motion to Suppress Evidence (hereinafter Defendant Gooch's "Motion to Suppress") (Doc. No. 110), both of which the Government opposes. This Court has jurisdiction pursuant to 18 U.S.C. § 3231. Venue is proper pursuant to Federal Rule of Criminal Procedure 18. For the reasons that follow, the Court will **GRANT in part** and **DENY in part** Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence (Doc. No. 28) and will **DENY** Defendant Charles J. Gooch, Jr.'s Motion to Suppress Evidence (Doc. No. 110).

### II.    BACKGROUND

On March 12, 2008, Defendants were indicted on one count of possession with intent to distribute a quantity of 3,4-methylenedioxyamphetamine, commonly known as ecstasy, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18

U.S.C. § 2. (Doc. No. 1.) The Indictment charges that on or about May 25, 2007, in the Western District of Pennsylvania, Defendants did knowingly, intentionally and unlawfully possess with intent to distribute a quantity of a Schedule I controlled substance commonly known as ecstasy. (*Id.*) Defendants pleaded not guilty. (See Doc. No. 16; Doc. No. 65.)

On July 7, 2009, Defendant Sterling Yazmin Long-Payton (hereinafter "Defendant Payton") filed a Motion to Suppress Evidence Obtained as a Result of an Unlawful Search and Seizure with Accompanying Citation of Authority. (Doc. No. 28.) The United States filed a response opposing this Motion on November 18, 2009. (Doc. No. 48.) On May 2, 2011, Defendant Charles J. Gooch, Jr. (hereinafter "Defendant Gooch") filed a Motion to Suppress Evidence. (Doc. No. 110.) The United States filed a response opposing this Motion on June 30, 2011. (Doc. No. 121). Defendant Payton twice moved to supplement her Motion to Suppress (Doc. No. 111; Doc. No. 120), both of which motions were granted on May 3, 2011 and July 14, 2011, respectively (see Doc. No. 112; Doc. No. 124). Defendant Gooch moved to supplement his Motion to Suppress (Doc. No. 119), which Motion was also granted on July 13, 2011 (Doc. No. 123).

Through their Motions Defendants seek to suppress all evidence obtained by law enforcement officials as a result of an automobile stop by Corporal Robert F. Johnson[1] of the Pennsylvania State Police on May 25, 2007. (See Doc. No. 28 at 1; Doc. No. 110 at 1.) Defendant Payton also moves to suppress all statements attributed to Defendant Payton and taken by the Pennsylvania State Police on or about May 25, 2007 and any evidence derived therefrom. (See Doc. No. 28 at 1.) A suppression hearing was held on July 19, 2011. (See Doc.

---

[1] At the time of the Suppression Hearing, Robert F. Johnson was a station commander in Bedford with the rank of Sergeant. (Doc. No. 133 at 3.) At the time of the events in question, Sergeant Johnson was assigned to the Bureau of Emergency and Special Operations where he held the rank of Corporal. (*Id.* at 3-4.) For purposes of this Memorandum Opinion, the Court will refer to Mr. Johnson with the rank held at the time relevant to the event being discussed.

No. 126.) At this hearing, the Government introduced into evidence: (1) the testimony of Sergeant Robert F. Johnson, an officer employed by the Pennsylvania State Police (see Doc. No. 133 at 3-183); (2) a video of the traffic stop and subsequent events that occurred on the Pennsylvania Turnpike on May 25, 2007 (Government Exhibit 1); and (3) the Pennsylvania State Police rights, warning and waiver form dated May 25, 2007 and executed by Defendant Payton (Government Exhibit 2). Defendants independently cross-examined Sergeant Johnson followed by a redirect-examination by the Government, a recross-examination by Defendant Gooch, and a redirect-examination by the Government. The Defendants introduced into evidence: (1) the testimony of Richard Villa, an investigator for the federal public defender (see Doc. No. 133 at 120-23); (2) the testimony of David Michalak, an expert on window tint testing and inspection (see id. at 123-74); (3) a photograph of the eastbound portal of the Allegheny Tunnel (Defendant's Exhibit A); (4) a photograph of the area outside the Allegheny Tunnel (Defendant's Exhibit B); (5) a copy of the written warning given to Defendant Payton by Corporal Johnson (Defendant's Exhibit C); (6) three pages of the report filled out by Corporal Johnson in connection with the instant investigation (Defendant's Exhibit D); (7) the criminal complaint sworn out by Corporal Johnson (Defendant's Exhibit E); (8) four photographs of the vehicle stopped in the instant case (Defendant's Exhibits F, G, H, and I); and (9) the certificate of salvage for the vehicle in the instant case (Defendant's Exhibit J). A transcription of the hearing (Doc. No. 132; Doc. No. 133) was produced. The parties subsequently filed their Proposed Findings of Fact and Conclusions of Law, as supplemented with permission of the Court.[2] (See

---

[2] Defendant Gooch supplemented his initial Proposed Findings of Fact and Conclusions of Law (Doc. No. 161) with Document Number 176, "Supplement to Defendant Charles Gooch's Proposed Findings of Fact and Conclusions of Law" (hereinafter the "Supplement"), as permitted by this Court's May 24, 2011 Order (Doc. No. 172). As explained in footnote 1 of Defendant Gooch's Supplement (Doc. No. 176), Defendant Gooch, through his Supplement, amended some but not all of the paragraphs of his previously submitted Proposed Conclusions of Law section and, for purposes of readability, reproduced his Proposed Conclusions of Law, as amended, in his Supplement in their entirety. (See Doc. No. 176 at 1.) For purposes of readability, the Court will refer to Defendant

Doc. No. 150; Doc. No. 161; Doc. No. 176; Doc. No. 187.) Following the submission of the Government's Proposed Findings of Fact and Conclusions of Law, entitled "Post-Hearing Brief of the United States" (Doc. No. 187), the Defendants filed a Joint Reply to the Post-Hearing Brief of the United States (hereinafter Defendants' "Joint Reply") (Doc. No. 191). The matter is now ripe for the Court's consideration.

## III. FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence presented at the July 19, 2011 Suppression Hearing.

On May 25, 2007, Corporal Robert F. Johnson of the Pennsylvania State Police was working a midnight shift with Sergeant Anthony DeLuca and Corporal Vincent Mock along the Pennsylvania Turnpike near the eastern side of the Allegheny Tunnel. (Doc. No. 133 at 3, 5-6, 38-39). At the time of the event, Corporal Johnson was a fifteen year veteran of the Pennsylvania State Police with over ten years of experience in highway interdiction work as a trooper and was assigned to the Bureau of Emergency and Special Operations as a canine handler. (*Id.* at 3-6.) As a canine handler, Corporal Johnson was responsible for assisting state, local, and federal agencies with drug investigations that required a narcotic detection canine. (*Id.* at 28.) When Corporal Johnson did not have such an assignment, he engaged in routine traffic enforcement, including drug interdiction. (*Id.* at 28-29, 74.)

During the course of this shift, Corporal Johnson parked his vehicle in the crossover area outside the eastbound side of the Allegheny Tunnel perpendicular to the two-lane westbound roadway, an estimated 15 to 20 feet from the edge of the westbound lane of traffic and an

---

Gooch's Proposed Findings of Fact and Conclusions of Law (Doc. No. 161) and Supplement (Doc. No. 176) collectively as Defendant Gooch's "Proposed Findings of Fact and Conclusions of Law" with the understanding that the Court is relying on Document Number 161, pages 1-18, for Defendant Gooch's initial matter and Proposed Findings of Fact and Document Number 176 in its entirety for Defendant Gooch's Proposed Conclusions of Law. The Court will cite to these documents separately, however, as appropriate.

estimated 50 to 80 feet from the entrance of the tunnel. (*Id.* at 5-6, 39, 42-43, 48.) Corporal Johnson was familiar with this stretch of highway, having spent a "vast majority" of his days in the area and having conducted several hundred vehicle stops around the area. (*Id.* at 5.) The lighting at the time and place in question was dark, with some overhead lighting provided by tall streetlamps that illuminated the tunnel but which was not very overwhelming or strong and lighting provided by the headlights of Corporal Johnson's patrol car. (*Id.* at 6.)

From this location, at approximately 3:30 a.m., Corporal Johnson observed a dark-in-color sedan, which he later discovered was driven by Defendant Payton and occupied by Defendant Gooch, pass his location in the right-hand lane at approximately 50-60 miles per hour.[3] (*Id.* at 5-6, 8, 14-16, 75-76.) Corporal Johnson viewed the vehicle's side for approximately one to three seconds, during which time Corporal Johnson noticed that the vehicle's driver's side windows were tinted in a manner classified by Corporal Johnson as "limo tint" and "very dark" window tint. (*Id.* at 8, 48-49, 76-77.) Following this observation, Corporal Johnson entered the left-hand lane of traffic and followed the vehicle through the Allegheny Tunnel with the intention of stopping the vehicle because Corporal Johnson believed the vehicle's windows were tinted in excess of the amount permitted by the Pennsylvania Vehicle Code. (*Id.* at 8-11, 49-50.) At some point between when Corporal Johnson moved his patrol car close to the vehicle Defendants were occupying and when Corporal Johnson stopped his patrol car, Corporal Johnson observed the rear deck brake light was only half operable. (*Id.* at 11, 13-14, 57-58.)

---

[3] The event at issue was captured on audio and video recording through a mobile video recorder system installed in Corporal Johnson's patrol car and a remote audio transmitter worn by Corporal Johnson. (Doc. No. 133 at 7-8.) The audio and video recording began when Corporal Johnson activated his emergency lights upon exiting the Allegheny Tunnel (*id.* at 7, 51-52), but the complete recording, admitted into evidence without objection as Government's Exhibit 1, also includes an additional video record of approximately thirty seconds prior to the activation of Corporal Johnson's emergency lights restored from the device's programmable memory while in standby mode (*id.* at 7).

Upon exiting the tunnel, Corporal Johnson pulled behind the dark sedan driven by Defendant Payton, at which point Corporal Johnson observed that the vehicle displayed Indiana registration plates. (*Id.* at 9, 10, 52-53.) Corporal Johnson activated his emergency lights and Defendant Payton quickly pulled over to the side of the highway in compliance with Corporal Johnson's signal to stop. (*Id.* at 52-53; <u>see</u> Government Exhibit 1.) Defendant Payton parked her vehicle[4] in close proximity to—approximately one foot from—the white fog line and approximately two to three vehicle lengths from a wide parking area on the highway's shoulder where several tractor trailer trucks were parked with their lights activated. (Doc. No. 133 at 17, 52-55, 79-81; Government Exhibit 1.) Although rarely experienced during his years conducting traffic stops, Corporal Johnson learned from his training in criminal and drug interdiction that drug traffickers sometimes park their vehicles very close to the white fog line to prevent the officer effecting the traffic stop from approaching the driver's side of the vehicle as a tactic to disorient an officer effecting a traffic stop. (Doc. No. 133 at 17-18, 54.) Corporal Johnson approached the passenger side of the vehicle, in response to which the occupants lowered the passenger-side window. (*Id.* at 14, 60.) Inside the vehicle were Defendants Gooch, who was seated in the passenger seat and appeared to be sleeping, and Payton. (*Id.* at 14-16.) Immediately upon Corporal Johnson's arrival at the passenger side of the vehicle Defendant Payton, who was seated in the driver's seat with her hands cupped around her stomach and was rocking back and forth in her seat, began complaining of pregnancy related cramps. (*Id.* at 14-16, 63-64.) Specifically, she stated: "I'm cramping up, I'm cramping up, I'm eight months pregnant, I'm cramping up." (*Id.*; Government Exhibit 1.) As Defendant Payton made these

---

[4] As stated below, the dark-in-color sedan (a Buick Park Avenue) (<u>see</u> Doc. No. 133 at 46, 153) driven by Defendant Payton was not owned by Defendant Payton or Defendant Gooch. However, for descriptive simplicity the Court will refer to the vehicle driven by Defendant Payton as "her vehicle," "Defendants' vehicle," "the Buick," and "the vehicle."

remarks, Defendant Gooch appeared to remain asleep. (Doc. No. 133 at 14-16, 63-64) Corporal Johnson requested that Defendant Payton provide him with her license and registration, which she provided. (*Id.* at 59.)

Corporal Johnson subsequently inquired where Defendants were traveling from, to which Defendant Gooch, now visibly awake, responded "New Jersey." (*Id.* at 16, 10.) Corporal Johnson then informed Defendants Payton and Gooch that he had stopped the vehicle because of the vehicle's tinted windows and stated that he intended to give Defendant Payton a written warning, but would then "get [Defendants] on [their] way." (*Id.* at 16; Government Exhibit 1.) After being informed that she would receive a written warning, Defendant Payton ceased holding her stomach and complaining of cramping symptoms. (Doc. No. 133 at 16, 64.) Before returning to his patrol car, Corporal Johnson asked Defendant Payton if she would need an ambulance, to which she replied "No." (*Id.* at 16, 61, 64.) Corporal Johnson considered the change in Defendant Payton's behavior to indicate that Defendant Payton had been feigning illness. (*Id.* at 64.) On June 11, 2007, Defendant Payton gave birth to a baby girl. (See *id.* at 89.)

Corporal Johnson returned to his patrol car with Defendant Payton's license and registration to prepare a written warning. (*Id.* at 16-17, 62.) After entering his patrol car, Corporal Johnson stated "I think I got one" while speaking on his radio, which broadcast to Corporal Mock and Sergeant DeLuca, and proceeded to describe the circumstances which led Corporal Johnson to believe that he had stopped a vehicle containing contraband. (*Id.* at 17-18, 63, 87; Government Exhibit 1.) Specifically, Corporal Johnson remarked that Defendant Payton complained about pregnancy related cramps upon his arrival at the vehicle while the passenger was "passed out on the seat," questioned "Don't you think if she was having some kind of

problem, the, the passenger would have known?," stated that the driver of the vehicle pulled over very close to the white fog line, and explained that he noticed a lack of luggage in the passenger compartment of the vehicle. (Doc. No. 133 at 17-18, 62-63; Government Exhibit 1.) During the course of this conversation, and in response to a question posed by one of the officers with whom Corporal Johnson was communicating by radio regarding the appearance of Defendant Payton, Corporal Johnson acknowledged that Defendant "may be pregnant." (Government Exhibit 1.) Corporal Johnson further noted that Defendant Payton was "doing everything, you know, [that] they [meaning seminars about criminal interdiction] historically say they do." (Doc. No. 133 at 55-56.)

Despite Corporal Johnson's observation that there was "nothing in the back seat at all . . . . There's no luggage, no nothing," one bag was present in and later removed from the back seat of the vehicle. (*Id.* at 64; Government Exhibit 1.) While in his vehicle, Corporal Johnson checked Defendant Payton's license and ran a criminal background check on Defendant Payton, including a check for violations of narcotics laws and weapons violations. (Doc. No. 133 at 18-19, 65-66 89-90.) As a result of these checks, Corporal Johnson learned that Defendant Payton had a valid driver's license, was not a wanted person, and had a criminal history consisting of a prior charge for an assault or battery. (*Id.* at 19, 66, 89-90.) Corporal Johnson also learned that Defendant Payton was not the owner of the vehicle. (See *id.* at 19-20.)

Corporal Johnson subsequently returned to the vehicle to hand back Defendant Payton's license and registration cards and issue the written warning. (*Id.* at 19, 92.) Upon doing so, Corporal Johnson inquired into the location of the owner of the vehicle. (*Id.* at 19.) Defendant Payton confirmed that she was not the owner of the vehicle and informed Corporal Johnson that the owner of the vehicle was her aunt, who was not present. (*Id.* at 19-20.) Corporal Johnson

then informed the occupants that the incident was being audibly and visually recorded, presented Defendant Payton with a written warning for the vehicle's tinted windows and partially operable center brake light, and asked Defendant Payton to sign the warning citation. (*Id.* at 93; Government Exhibit 1; Defendant's Exhibit C.) As Defendant Payton was signing the written warning, Corporal Johnson asked Defendant Gooch to refrain from lighting a cigarette so that Defendant Gooch would not blow smoke on Corporal Johnson. (Doc. No. 133 at 67-68.) After Defendant Payton handed a signed copy of the warning to Corporal Johnson, Defendant Payton asked where the next rest stop was located. (*Id.* at 67, 93.) Corporal Johnson replied that it was six to eight miles up the road. (*Id.* at 93; Government Exhibit 1.) Responding to a question by Defendant Gooch, Corporal Johnson also informed Defendants that the equipment problem was nothing to worry about and could be taken care of when the Defendants returned home. (Doc. No. 133 at 93; Government Exhibit 1.) Corporal Johnson then told Defendants to have a safe trip and began to walk away from Defendants' vehicle in the direction of his patrol car. (Doc. No. 133 at 68, 93; Government Exhibit 1.)

After taking approximately two to three steps and reaching the rear wheel of the vehicle, Corporal Johnson turned and re-approached the front passenger side of the vehicle. (Doc. No. 133 at 68, 93-94; Government Exhibit 1.) Corporal Johnson initiated a conversation by asking the occupants where they had been in New Jersey and inquiring as to the length of their stay. (Doc. No. 133 at 68, 70, 94; Government Exhibit 1.) Defendant Payton responded that Defendants had been in Newark, New Jersey and that she had left Indianapolis the previous day, travelled to Newark to drop off her daughter, and was returning home. (Doc. No. 133 at 70, 94; Government Exhibit 1.) Corporal Johnson believed that the distance from Indianapolis, Indiana to Newark, New Jersey was about 750 miles and required 12 hours of travel time. (Doc. No. 133

at 23.) Corporal Johnson then informed the Defendants that Pennsylvania was having a big problem with guns, drugs, and large sums of money on the Turnpike and asked Defendants if there was anything like that in the vehicle. (Doc. No. 133 at 69, 94-95; Government Exhibit 1.) Defendant Payton replied that there was not. (Doc. No. 133 at 95.) Corporal Johnson then asked Defendant Payton if she had any belongings or luggage-type items with her, to which she responded "just my, uh, book bag in the trunk." (*Id.* at 94-95; Government Exhibit 1.)

Hearing this, Corporal Johnson replied: "Just your book bag . . . I'll tell you what, do you have any problem with me taking a quick peek and then we'll get you on your way?" (Doc. No. 133 at 69, 95, 97; Government Exhibit 1.) When Defendant Payton responded that she did not, Corporal Johnson replied "Okay, you want to step out and show me that?" (Doc. No. 133 at 95, 97; Government Exhibit 1.) Defendant Payton responded by promptly popping open the trunk's hood from the driver's seat and exiting the vehicle. (Doc. No. 97-98; Government Exhibit 1.) Corporal Johnson inquired as to whether Defendant Gooch had any identification (Government Exhibit 1) and then approached the trunk from the passenger's side of the vehicle, where he met Defendant Payton who was approaching the trunk from the driver's side of the Buick. (Doc. No. 98-99; Government Exhibit 1.) Defendant Payton extended her arm and index finger toward an object in the trunk and stated "that's my book bag . . . ." (Doc. No. 133 at 98-99; Government Exhibit 1.) As she did so, Corporal Johnson instructed her to stand to the passenger side of the vehicle, away from the book bag, so that she would not be injured by vehicles on the Turnpike and so that he could inspect the bag. (Doc. No. 133 at 99; Government Exhibit 1.) Defendant Payton complied, standing adjacent to the rear corner of the passenger side of the vehicle, and remained there while Corporal Johnson searched the book bag and performed a visual search of the interior of the trunk. (See Doc. No. 133 at 21-22; 101-03; Government Exhibit 1.)

As Defendant Payton moved away from the Turnpike, Corporal Mock arrived on the scene and stood between Corporal Johnson's patrol car and Defendants' vehicle. (Doc. No. 133 at 99-101; Government Exhibit 1.) Corporal Johnson then asked Defendant Payton whether she understood that she was not under arrest. (*Id.*) As Defendant Payton began to answer, Corporal Johnson began another conversation by asking Defendant Payton how far along she was in her pregnancy. (Doc No. 133 at 101; Government Exhibit 1.) Corporal Johnson and Defendant Payton conversed about Defendant Payton's pregnancy, travels, and prior arrest as Corporal Johnson searched Defendant Payton's book bag. (*Id.* at 101-03; Government Exhibit 1.) Corporal Johnson also inquired into Defendant Payton's connection to the passenger, Defendant Gooch, and Defendant Payton explained that Defendant Gooch was her cousin's baby's father. (Government Exhibit 1.) The tone of this conversation was friendly and cordial. (See *id.*)

As Defendant Payton stood at the rear of the trunk, she fidgeted and shifted her weight from side to side. (*Id.*) During the search, Corporal Johnson inquired whether Defendant Payton was okay. (*Id.*; Doc No. 133 at 102.) Defendant Payton stated that she was and "just [had] to pee." (Doc. No. 133 at 101-02; Government Exhibit 1.) As Corporal Johnson examined Defendant Payton's book bag, he also visually inspected the trunk compartment. (See Doc. No. 133 at 21-22.) In so doing, Corporal Johnson observed that the trunk liner on the right side of the trunk interior was smooth, as if it had come from the factory, while the left inside corner was loose and looked like it "had been worked." (*Id.* at 22, 113.) Corporal Johnson further observed that a small piece of plastic bag was sticking up from behind the trunk liner.[5] (*Id.* at 22, 104,

---

[5] Defendant Payton calls attention to the fact that Corporal Johnson, despite testifying at the Suppression Hearing that he observed a small piece of plastic bag sticking up from behind the trunk liner, never mentioned this observation in either his Incident Report (Defendant's Exhibit D) or Affidavit of Probable Cause (Defendant's Exhibit E at 4) that accompanied the Criminal Complaint. (See Doc. No. 150 at 40.) However, after observing Corporal Johnson at the Suppression Hearing and examining the evidence, the Court credits Corporal Johnson's testimony that he observed a piece of plastic bag sticking up from behind the trunk liner on the left side of the vehicle.

106-07, 113.) Desiring to see what this item was, Corporal Johnson pulled down the trunk liner and extracted a white cellophane bag that contained several vacuum-sealed bags full of white tablets. (*Id.* at 22, 104-07.) Corporal Johnson then remarked, "We have a problem here" and directed Defendant Payton away from the vehicle as Sergeant DeLuca arrived at the scene. (*Id.* at 22-23, 105.) Corporal Johnson asked Sergeant DeLuca if he believed the tablets were ecstasy and Sergeant DeLuca opined that they were. (Government Exhibit 1.) The officers ordered Defendant Gooch out of the vehicle while Sergeant DeLuca stood nearby with his service weapon pointed at the passenger compartment of the vehicle. (*Id.*; Doc. No. 133 at 106.) After Defendant Gooch was outside of the vehicle, the officers placed Defendant Gooch in handcuffs. (Government Exhibit 1.)

Corporal Johnson then returned to Defendant Payton who was visibly upset and stating that she knew nothing about the ecstasy, needed to use restroom, and wanted to go home. (*Id.*; Doc. No. 133 at 106.) Corporal Johnson attempted to reassure Defendant Payton and told her not to worry. (Government Exhibit 1.) In response to a statement by Defendant Payton, Corporal Johnson informed Defendant Payton that he did not want her to "get on the phone" and instead told her to sit on the passenger seat of the vehicle. (*Id.*) Corporal Johnson later returned to Defendant Payton, still seated in the passenger seat of the vehicle, and advised her of her rights by stating as follows:

> My name is Corporal Robert M. Johnson [*sic*] of the Pennsylvania State Police and wish to advise you that you have an absolute right to remain silent, that anything you say can and will be used against you in a court of law, that if you wish to have an attorney present during questioning you can have one if you so desire, ok? I'm not going to make you any promises, threats or anything like that, but, uh, you know, I just gotta let you know that, you know . . . .

(*Id.*) Defendant Payton stated that she believed she understood her rights and began to answer questions posed by Corporal Johnson. (*Id.*) Corporal Johnson did not specifically inform Defendant Payton that an attorney would be provided for her if she could not afford one. (See *id.*) Defendant Payton was handcuffed and Defendants Payton and Gooch were thereafter removed from the scene and taken to the Pennsylvania State Police barracks. (*Id.*; Doc. No. 133 at 23, 119.) At the barracks, Defendant Payton was again advised of her rights by Trooper Jeffrey Brautigam. (Doc. No. 133 at 119.) Defendant Payton executed a written "Rights Warning and Waiver" form, which included a statement informing Defendant Payton that an attorney would be appointed to represent her if she could not afford to hire one and which was witnessed and signed by Trooper Volk. (Doc. No. 133 at 23, 119; Government Exhibit 2.)

At some time after the arrest, photographs were taken of the Buick. (Doc. No. 133 at 115-16.) These photographs were admitted into evidence at the Suppression Hearing as Defendant's Exhibits F, G, H, and I. (*Id.* at 114-16.) The photographs, which depict the vehicle and its windows, were taken during the daytime while the car was parked in a lot. (See *id.* at 115-17.) Of the four exhibits, only Exhibit F shows the driver's side of the vehicle—the side observed by Corporal Johnson on May 25, 2007 prior to stopping Defendants' vehicle. (*Id.* at 116-18.) Exhibits G, H, and I depict the passenger side of the vehicle at varying angles and distances. (*Id.*; Defendant's Exhibits G, H, I.)

At the Suppression Hearing, Defendant Gooch called Mr. Richard Villa to testify about the whereabouts of the Buick that was driven by Defendant Payton on May 25, 2007. (Doc. No. 133 at 121.) Mr. Villa testified that the vehicle had been salvaged and crushed. (*Id.* at 121.) Defendant Gooch also called Mr. David Michalak to testify regarding acceptable levels of vehicle window tint. (*Id.* at 123, 149-52.) Mr. Michalak is an ASE master level certified

automotive technician with extensive experience in window tinting testing and inspection but with no training or experience in the enforcement of the vehicle code relative to window tinting violations. (*Id.* at 124-29, 131-46, 149.) Following voir dire, Mr. Michalak was permitted to testify as an expert on window tint testing and inspection. (*Id.* at 149-52.) In his testimony, Mr. Michalak opined that the Buick's windows were not tinted beyond the level of tint installed by the original manufacturer and that the vehicle was in compliance with Pennsylvania's window tint rules and regulations. (*Id.* at 160, 163.) Mr. Michalak based his testimony on Government Exhibit 1, the audio and video recording of the event at issue, and Defendant's Exhibits F, G, H, and I—photographs of the Buick taken in daylight—because the Buick had been salvaged and crushed and was not available for Mr. Michalak's direct review. (*Id.* at 120-22, 148, 151-57, 168-70.)

## IV. CONCLUSIONS OF LAW

Evidence obtained from an illegal search or seizure is subject to suppression under the fruit of the poisonous tree doctrine. *Weeks v. United States*, 232 U.S. 383, 398 (1914); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Defendants advance several arguments in support of their motions to suppress all evidence obtained as a result of the stop and search of Defendants' vehicle on May 25, 2007. In brief, Defendants raise the following arguments: (A) the initial stop of Defendants' vehicle was not supported by probable cause and/or reasonable suspicion, (B) the Pennsylvania window tint statute, 75 Pa. Cons. Stat. § 4524(e), that served as the basis for the traffic stop violates the Commerce Clause of the United States Constitution, (C) Defendants were unlawfully detained following the issuance of the written warning, (D) any consent to search given by Defendant Payton was invalid and, even if such consent was valid, Corporal Johnson's search exceeded the scope of any consent given, and (E) Corporal Johnson's

search of the trunk of the vehicle was not supported by probable cause and therefore is not justified pursuant to the automobile exception. Defendant Payton additionally argues as follows: two sets of statements made by Defendant Payton must be suppressed because the *Miranda* warnings given to Defendant Payton at the scene were inadequate (F), and all evidence obtained from Defendant Payton's cell phone as a result of the execution of the search warrant(s) must be suppressed (G). The Court will address each of these arguments in turn.

### A.    Lawfulness of the Traffic Stop

Defendants contend that the evidence must be suppressed because the initial stop of Defendants' vehicle was unsupported by probable cause and/or reasonable suspicion of a motor vehicle code violation.[6] (See Doc. No. 150 at 19-23; Doc. No. 176 at 1-12; Doc. No. 191 at 1-4.) The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). When a vehicle is stopped, everyone in the vehicle, not just the driver, is seized. *United States v. Walker*, 719 F. Supp. 2d 586, 592 (W.D. Pa. 2010) (citing *Prouse*, 440 U.S. at 653); see also *Brendlin v. California*, 551 U.S. 249, 251 (2007).

A routine traffic stop is constitutional when it is supported by reasonable suspicion.[7] *United States v. Johnson*, 452 Fed. Appx. 219, 225 (3d Cir. 2011) (citing *United States v. Delfin-*

---

[6] In his Supplement, Defendant Gooch contends that the evidence must be suppressed because the stop was not supported by probable cause of a motor vehicle code violation. (See Doc. No. 176 at 2-3.) As explained *infra*, to establish the legality of the traffic stop the Government need only prove that the stop is supported by reasonable suspicion that an individual has violated the traffic laws, see *United States v. Johnson*, 452 Fed. Appx. 219, 225 (3d Cir. 2011); *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3rd Cir. 2006), but the application of this lower standard has no bearing on the substantive outcome of Defendants' motion.

[7] Defendant Gooch argues that the appropriate standard for assessing the legality of a traffic stop based on an observed motor vehicle code violation is probable cause. (See Doc. No. 176 at 2-3). Indeed, in *Whren v. United States*, 517 U.S. 806, 810 (1996), the Supreme Court stated that "the decision to stop an automobile is reasonable

*Colina*, 464 F.3d 392, 397 (3rd Cir. 2006)). Under the reasonable suspicion standard, the government has the initial burden of providing "'specific, articulable facts' to justify a reasonable suspicion to believe that an individual has violated the traffic laws." *Delfin-Colina*, 464 F.3d at 397. "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). "[A]n officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Delfin-Colina*, 464 F.3d at 398. An officer executing a lawful traffic stop based on a violation of a traffic code must, however, observe a traffic violation prior to initiating the traffic stop; *ex post facto* justifications are impermissible. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012); cf. *Delfin-Colina*, 464 F.3d at 398. When assessing whether the traffic stop was supported by reasonable suspicion, a court must consider the totality of the circumstances. *United States v. Johnson*, 592 F.3d 442, 448-49 (3rd Cir. 2010).

---

where the police have probable cause to believe that a traffic violation has occurred." As explained in *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3rd Cir. 2006), however, the phrase "probable cause" was used in response to the situation before the Supreme Court and did not alter "the longstanding reasonable suspicion standard recognized in the traffic-stop setting." The Third Circuit subsequently held that "the *Terry* reasonable suspicion standard applies to routine traffic stops." *Id.* *Brendlin v. California*, 551 U.S. 249 (2007), which Defendant Gooch cites in support of his argument that the probable cause standard applies, does not alter this standard. In *Brendlin*, the Court held that when a police officer makes a traffic stop, a passenger is seized within the meaning of the Fourth Amendment and may challenge the constitutionality of the stop. *Id.* at 251. In explaining its decision, the Court, citing *Whren*, compared precedent stating that at least articulable and reasonable suspicion is required to support random, investigative traffic stops and that an automobile stop is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Id.* at 263 n.7. The Court did not, however, draw a distinction between the two types of stops, establish that different standards apply for different types of stops, or suggest that the probable cause language quoted from *Whren* represented the minimum standard that must be met to render lawful a stop based on a belief that a traffic violation has occurred. See *id.* Additionally, the Third Circuit has continued to apply the reasonable suspicion standard to stops premised on motor vehicle code violations since *Brendlin*. See, e.g., *United States v. Comegys*, No. 11-3630, 2012 U.S. App. LEXIS 23364, at *8 (3d Cir. Nov. 14, 2012); *United States v. Lewis*, 672 F.3d 232, 237 (3rd Cir. 2012); *Johnson*, 452 Fed. Appx. at 225; *United States v. Johnson*, 434 Fed. Appx. 159, 162 (3rd Cir. 2011). Nonetheless, for the same reasons that support the Court's conclusion that Corporal Johnson's decision to stop Defendants' vehicle was supported by reasonable suspicion, the Court also finds that Corporal Johnson decision to stop Defendants' vehicle was supported by probable cause. Therefore, the traffic stop here was reasonable and did not violate the Fourth Amendment even under the more demanding probable cause standard.

In this case, Corporal Johnson allegedly stopped Defendants' vehicle for a perceived violation of the Pennsylvania statute governing window tinting, 75 Pa. Cons. Stat. § 4524(e), and for driving a vehicle with a partially inoperable rear deck break light, apparently in violation of 75 Pa. Cons. Stat. § 4303(b). (See Doc. No. 133 at 13-14, 57; Doc. No. 187 at 3.) Despite the Government's assertion that Corporal Johnson observed that the Defendants' vehicle's rear deck brake light was only half operable prior to stopping Defendants' vehicle and that this vehicle code violation provided a justification for the stop (see Doc. No. 187 at 3, 11), the record is unclear regarding precisely when Corporal Johnson observed a problem with Defendants' vehicle's rear deck brake light. (Compare Doc. No. 133 at 13-14, 57:6-9 with Doc. No. 133 at 11, 57:18-21, 58.) Because the Government has not sufficiently established that Corporal Johnson observed a malfunction of the vehicle's brake light prior to stopping Defendants' vehicle, this violation cannot provide a legal justification for the stop. Nonetheless, the stop of the Buick was based on an articulable and reasonable suspicion that the vehicle's tinted windows violated the law. See *Johnson*, 452 Fed. Appx. at 225 (holding that stop of vehicle was based on articulable and reasonable suspicion that either the vehicle or an occupant violated the law where officer stopped vehicle because of tinted windows in violation 75 Pa. Cons. Stat. § 4524(e) and loud music).

Title 75, Pennsylvania Consolidated Statutes, Section 4524(e) governs vehicle windshield obstructions. In relevant part, it provides:

> (e) Sun screening and other materials prohibited.
>
> > (1) No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.

> (2) This subsection does not apply to:
>
>> (i) A vehicle which is equipped with tinted windows of the type and specification that were installed by the manufacturer of the vehicle or to any hearse, ambulance, government vehicle or any other vehicle for which a currently valid certificate of exemption has been issued in accordance with regulations adopted by the department.
>>
>> . . . .

75 Pa. Cons. Stat. § 4524(e).

Here, Corporal Johnson, a trooper with over ten years of experience in highway interdiction, personally observed Defendants' vehicle travelling along a familiar stretch of highway. (See Doc. No. 133 at 3-6.) Corporal Johnson observed the driver's side windows of the Defendants' vehicle for one to three seconds as it passed his location while travelling within the speed limit. (See id. at 48-49, 75-77.) Although nighttime, some lighting was provided by very tall street lamps and additional lighting was provided by the headlights of Corporal Johnson's patrol car. (See id. at 6.) Corporal Johnson testified that from his location, he observed that the windows of the vehicle were "heavily tinted" and that the window tint was significant to the point that—from his vantage point—one could not see into the vehicle, even with the lighting above. (See id. at 8.) Corporal Johnson further testified that, based on his experience, the tint of the vehicle's window was greater than that permitted by Pennsylvania law and "was on the verge of extreme window tinting." (See id. at 8-11.)

At the Suppression Hearing, Defendant Gooch offered testimony of David Michalak to cast doubt on Corporal Johnson's observations regarding the level and type of tint on the vehicle's windows. An expert on window tint testing and inspection, Mr. Michalak opined that the tint on the vehicle's windows was in compliance with Pennsylvania's window tint rules and regulations. (See id. at 124-29, 131-46, 149.) While the Court finds that Mr. Michalak is a

credible witness, Defendants' arguments fail to persuade the Court that Corporal Johnson did not have an articulable and reasonable suspicion, or even probable cause, to believe that the vehicle's tinted windows violated the law. Although Mr. Michalak has considerable experience in window tinting testing and inspection, Mr. Michalak has no training or experience in the enforcement of the vehicle code relative to window tint violations. (See *id.* at 140, 142-43.) Additionally, the observations upon which Mr. Michalak based his opinion were made under vastly different circumstances than the circumstances under which Corporal Johnson made his observations. Mr. Michalak observed the vehicle only through photographs and videos. (*Id.* at 153.) The photos observed by Mr. Michalak were taken during daylight hours while the car was stationary in a parking lot (see *id.* at 115-17; Defendant's Exhibits F, G, H, I), and thus depict the vehicle at a different location and under different lighting conditions then when it was observed by Corporal Johnson. Only one of these photos, and no portion of the video, that Mr. Michalak observed and later analyzed in Court depicts the exterior of the driver's side of the vehicle—the side observed by Corporal Johnson on May 25, 2007 and the side that provided the basis for his decision to effect the traffic stop (see Doc. No. 133 at 118; Government Exhibit 1). While a conclusion based on these observations may have relevance to whether Defendant's windows actually violated the statute at issue, they have far less relevance to the issue that is actually before the Court—whether Corporal Johnson had reasonable suspicion to believe that Defendants' vehicle violated 75 Pa. Cons. Stat. § 4524(e). Although Mr. Michalak demonstrated at the Suppression Hearing that objects could be seen through the windows of the vehicle while it was parked on the side of the highway during the event at issue, all of these demonstrations involved objects seen through windows other than the driver's side windows—windows that did not provide the basis for the stop—or objects that could be seen by looking from the inside of the

vehicle out, a view opposite of that addressed by the statute and observed by Corporal Johnson prior to stopping the Defendants. (See Doc. No. 133 at 48-49, 159-62; Government Exhibit 1.)

Defendants also argue that the alleged window tint violation does not provide a legal basis for the stop because there was no suggestion that the tint on the vehicle's windows was not installed by the manufacture and therefore Corporal Johnson lacked sufficient cause to suspect a violation of 75 Pa. Cons. Stat. § 4524(e). (See Doc. No. 150 at 22.) In *United States v. Hall*, 270 Fed. Appx. 123, 126 (3d Cir. 2008), the defendant similarly argued that the tint on his windows did not provide the reasonable suspicion needed to effect the traffic stop because "the officers had no way of knowing at the time of the stop whether the tint was part of the original equipment or was applied after the vehicle was manufactured." The Third Circuit found that the tint on the windows of the defendant's vehicle, which prevented anyone from viewing the interior of the vehicle, was sufficient to establish reasonable suspicion that the defendant had violated a traffic ordinance, and "[t]he officers' inability to determine at the time of the stop whether [the defendant]'s windows were tinted by the [vehicle]'s manufacturer does not mean that the stop was unsupported by reasonable suspicion." *Id.* at 126. This Court similarly finds that Corporal Johnson's lack of knowledge regarding the source of the window's tint does not mean that the stop was unsupported by reasonable suspicion or probable cause.

Finally, Defendants argue that Corporal Johnson's testimony that he did not observe any luggage in the vehicle's back seat proves that an individual could see through the vehicle's side windows, thereby demonstrating compliance with 75 Pa. Cons. Stat. § 4524(e) and demonstrating that the stop was not reasonable. The Court finds that this argument is premised upon the assumptions that Corporal Johnson observed the back seat through the vehicle's rear

passenger side window,[8] as opposed to the open front passenger side window, and that this rear window had the same level of tinting as the driver's window—assumptions which are not supported by the record. Even taking these assumptions as true, however, the Court finds that an officers ability to discern an absence of objects in the back seat of a vehicle while standing directly above of it and shining a light directly into the vehicle does not mean that the stop was unsupported by reasonable suspicion or probable cause to believe that the vehicle's windows were tinted in violation of 75 Pa. Cons. Stat. § 4524(e). In conclusion, the Court finds that Corporal Johnson's decision to make a stop based on a window tint violation was supported by reasonable suspicion and probable cause, and Mr. Michalak's testimony and Defendants' arguments fail to convince the Court otherwise.

**B.  Constitutionality of 75 Pa. Cons. Stat. § 4524(e)**

Defendants contend that the evidence recovered must be suppressed because Pennsylvania's window tint statute, 75 Pa. Cons. Stat. § 4524(e), which served as the basis for the traffic stop in this case, violates the Commerce Clause of the United States Constitution. (See Doc. No. 150 at 23-24; Doc. No. 176 at 26-32.) This argument is unavailing. When an officer acts in objectively reasonable reliance on a validly enacted statute, the exclusionary rule does not apply even if the statute is subsequently declared unconstitutional. See *Illinois v. Krull*, 480 U.S. 340, 349, 354-55 (1987). This is because:

> [t]he application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a

---

[8] Corporal Johnson did not approach the driver's side of the vehicle until after the ecstasy tablets were discovered. (See Government Exhibit 1.)

judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.

*Id.* at 349-50.

This exception to the application of the exclusionary rule is not without limitation, however.

A statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws. Nor can a law enforcement officer be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional.

*Id.* at 355.

Even if 75 Pa. Cons. Stat. § 4524(e) is repugnant to the Constitution, the good faith exception to the exclusionary rule applies to this case. Here, Corporal Johnson effected the vehicle stop pursuant to his belief that the vehicle's windows violated a validly enacted Pennsylvania statute. Corporal Johnson's reliance on this statute in carrying out his duty was objectively reasonable. Title 75, Pennsylvania Consolidated Statutes, Section 4524(e) is "a commonplace automotive equipment safety regulation of the kind which fits neatly into the traditional 'police power' of state and local governments to regulate the health, safety, welfare, and morals of the community[,]" see *United States v. Moreno*, 43 Fed. Appx. 760, 766-67 (6th Cir. 2002) (characterizing a Memphis City Code section regulating window tint on motor vehicles) and which is not unlike statutes found in other localities, see *id.* (discussing a similar statute regulating window tint in Memphis, Tennessee). Further, there is no indication that the legislature wholly abandoned its responsibility to enact constitutional laws in passing this statute. Consequently, because the contested traffic stop was justified pursuant to Corporal Johnson's good faith enforcement of 75 Pa. Cons. Stat. § 4524(e), the ultimate validity of the statute is not material to the instant motions and the Court has no occasion to resolve Defendants' constitutional argument.

## C. The Encounter Between Defendants and Corporal Johnson Following the Issuance of the Written Warning

Defendants contend that they were unlawfully detained following the conclusion of the traffic stop. (See Doc. No. 150 at 25-28; Doc. No. 176 at 12-26; Doc. No. 191 at 5-6.) Specifically, Defendants contend that the encounter that ensued between Defendants and Corporal Johnson after the written warning was issued (hereinafter the "second encounter") constituted a seizure, and not a consensual encounter,[9] that was unsupported by reasonable suspicion that criminal activity was afoot.[10] (See Doc. No. 150 at 25-28; Doc. No. 176 at 12-13; Doc. No. 191 at 5.)

Before addressing Defendants' arguments that the alleged continued detention of Defendants Gooch and Payton was unsupported by reasonable suspicion, the Court must decide whether a seizure occurred. See *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *United States v. Williams*, 413 F.3d 347, 352 (3rd Cir. 2005) ("The first analytical step a court takes to evaluate the issues involved in this type of motion to suppress is to determine whether and when a citizen-police encounter implicates the Fourth Amendment. 'Before even

---

[9] In his Proposed Findings of Fact and Conclusions of Law, Defendant Gooch sets out several reasons why the period following the issuance of the written warning was not a consensual encounter. (See Doc. No. 176 at 13-17.) Although Defendant Payton disputes the legality of what she characterizes as a continued "detention" in her Proposed Findings of Fact and Conclusions of Law (see Doc. No. 150 at 25), Defendant Payton does not specifically argue that this was not a consensual encounter. In Defendants' Joint Reply, however, Defendant Payton joins Defendant Gooch in arguing that the period following the issuance of the written warning was not a consensual encounter. (See Doc. No. 191 at 5-6.) Therefore, although some arguments regarding this proposed conclusion are raised solely in Defendant Gooch's Proposed Findings of Fact and Conclusions of Law, because Defendant Payton joins Defendant Gooch in arguing that the second encounter was not consensual, the Court will attribute the arguments found in Defendant Gooch's Proposed Findings of Fact and Conclusions of Law to both Defendants.

[10] Within the section of Defendant Payton's Proposed Findings of Fact and Conclusions of Law in which she argues that that the "continued detention of Payton once the traffic stop had concluded was unsupported by reasonable suspicion," Defendant Payton also states that Corporal Johnson extended the time necessary to complete the traffic stop by several minutes by conferring with other officers regarding his suspicions, preparing a consent to search form, and running a check on Defendant Payton's criminal history. (See Doc. No. 150 at 25.) While it is unclear how this statement relates to Defendant Payton's argument that Corporal Johnson did not have reasonable suspicion to support an investigatory detention aimed at the discovery of contraband following the conclusion of the traffic stop, the Court finds that the record does not support Defendant Payton's suggestion that the traffic stop, which lasted approximately 11 minutes and 40 seconds from the stop to the time the consensual encounter began, was so dilatory that it became unlawful. See *United States v. White*, 80 Fed. Appx. 230, 231 (3rd Cir. 2004) (finding that twenty minutes is not objectively unreasonable for a traffic stop.)

addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] 'seized' by the police' within the meaning of the Fourth Amendment.").

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "[A] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *United States v. Wilson*, 413 F.3d 382, 386-87 (3rd Cir. 2005) (quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). Circumstances that might indicate a seizure include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall*, 446 U.S. at 554. Ultimately, the relevant inquiry is whether, under the totality of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter . . . .'" *United States v. Kim*, 27 F.3d 947, 951 (3rd Cir. 1994); see also *Wilson*, 413 F.3d at 386-87.

Here, neither Defendant argues that the alleged seizure occurred by use of actual physical force and the record is devoid of such evidence. Thus, the Court must decide whether Defendants were seized by means of a show of authority such that a reasonable person would not feel free to leave. Defendants assert that Corporal Johnson manifested a "personal show of

authority" and that this, combined with the surrounding circumstances, "did not amount to a . . . situation where 'a reasonable person would feel free to go about his business . . . .'" (See Doc. No. 176 at 16 (quoting *Kim*, 27 F.3d at 951)). The Court disagrees with Defendants' interpretation of the facts. Defendants assert that, during this period, "the vocal tone of Corporal Johnson shifted between cordial and authoritative." (See *id.* at 13.) The Court, however, after reviewing the evidence, finds that the vocal tone of Corporal Johnson remained cordial up until the time the ecstasy tablets were discovered. (See Government Exhibit 1.) While Corporal Johnson did, at times, raise the volume of his voice to enable himself to be heard over the sounds of passing traffic, the tone used between the time he re-approached Defendant's vehicle and the time the ecstasy tablets were discovered was casual and stands in stark contrast to the clearly authoritative tone later used by Corporal Johnson when ordering Defendant Gooch out of the vehicle. (See *id.*) Additionally, Corporal Johnson did not fire a series of "rapid-fire questions" at Defendants, as Defendants claim. (See *id.*; Doc. No. 176 at 14.) In fact, as demonstrated by Government Exhibit 1 and Defendant Gooch's recitation of a portion of the dialogue that occurred during the second encounter in his Proposed Findings of Fact and Conclusions of Law (see Doc. No. 176 a 14), Corporal Johnson paused and fumbled over his words at least once during the brief conversation identified by Defendants (see *id.* at 14-15).

In arguing that this interaction was not a consensual encounter, Defendants place heavy significance on the fact that Corporal Johnson "moved his pinch pad from his right hand to his left arm and appears to place his right hand on or about his holstered firearm" while explaining that that Pennsylvania was having a problem with guns, drugs, and large sums of money on the Turnpike. (See *id.* at 15-16.) However, the exhibit cited by Defendants to support this assertion merely shows that Corporal Johnson moved his right arm to the right side of his body, which is

not visible in the video introduced into evidence. (See Government Exhibit 1.) The evidence introduced therefore does not show that Corporal Johnson placed his hand on or about his firearm, let alone brandished his firearm or otherwise made a "show of force." (See *id.*) The mere fact that an officer wears uniform and a holstered sidearm does not, without more, create intimidation sufficient to overcome the resolve of a reasonable person. *United States v. Drayton*, 536 U.S. 194, 202 (2002); *United States v. Escobar*, No. 1:05-cr-0487, 2006 U.S. Dist. LEXIS 29735, at *12 (M.D. Pa. Apr. 27, 2006).

Defendants argue that, in addition to Corporal Johnson's alleged show of authority, the circumstances surrounding the traffic stop were not those where one would feel free to leave. (See Doc. No. 176 at 16.) That the second encounter took place on the side of the highway, while a factor to be considered, does not transform the event into a seizure. See *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("Where the encounter takes place is one factor, but it is not the only one."); *Wilson*, 413 F.3d at 387. Here, the second encounter took place on the berm of the roadway after Corporal Johnson bid the Defendants goodbye and began to return to his patrol car. (See Doc. No. 133 at 53, 93-95.) This is true of many traffic stops. See *Wilson*, 413 F.3d at 387 (stating that the fact that a defendant is isolated on the side of a highway while an officer questions him is "true of many traffic stops;" finding that the record showed no circumstances so intimidating that they would have caused a reasonable person to perceive he was not free to leave where defendant was isolated on the side of a highway while officer questioned him after traffic stop, and that isolation on side of highway was not sufficient to distinguish the case from *United States v. Drayton*, 536 U.S. 194 (2002), where no seizure occurred). Upon his return to Defendant's location, Corporal Johnson reengaged Defendants in dialogue with a conversational tone. (See Doc. No. 133 at 68, 70, 93-94; Government Exhibit 1.) Defendants were free to

decline to answer Corporal Johnson's questions and Corporal Johnson was under no obligation to inform Defendants that they were free to go when he began inquiring into their travel plans. See United States v. Walker, 719 F. Supp. 2d 586, 595 (W.D. Pa. 2010) (citing Ohio v. Robinette, 519 U.S. 33, 35 (1996) (holding that a lawfully seized individual need not be informed that he or she is free to go for a consent to search to be recognized as voluntary)). The lights which remained activated on Corporal Johnson's patrol car while Corporal Johnson and Defendants engaged in conversation following the conclusion of the traffic stop were not related to the second encounter between Corporal Johnson and the Defendants. The Court finds that a reasonable person would understand that these lights were a vestige of the prior stop and would not have been so intimidated by these circumstances that she would not have felt free to leave or otherwise terminate the encounter. See United States v. Birt, 120 Fed. Appx. 424, 427 (3rd Cir. 2005) (finding that a reasonable person would not have been so intimated by the circumstances of an encounter between a trooper and driver that took place on the side of a busy highway following a traffic stop where two officers and a drug dog were present and the lights of both officers' patrol cars were flashing that he would not have felt free to leave; affirming District Court's finding that the continued encounter between the trooper and defendant following issuance of a traffic warning was consensual).

Additionally, during the course of the second encounter, Corporal Johnson's statements took the form of questions and requests rather than demands. After Defendant Payton agreed to Corporal Johnson's request to take a look at her book bag, the voluntariness of which is discussed infra, Corporal Johnson asked Defendant Payton if she would step out and show him the item and inquired as to whether Defendant Gooch had any identification. (See Doc. No. 133 at 95, 97; Government Exhibit 1.) Corporal Johnson and Defendant Payton continued to engage

in light question-and-answer style conversation about Defendant Payton's pregnancy and her relation to Defendant Gooch while Corporal Johnson executed his search of Defendant Payton's book bag at the rear of the vehicle and asked if Defendant Payton understood that she was not under arrest. (See Doc. No. 133 at 101-03; Government Exhibit 1.) Although Corporal Mock arrived on the scene and was present while Corporal Johnson and Defendant Payton conversed at the rear of the vehicle, the presence of multiple troopers on the scene does not automatically transform an encounter into a seizure. See *Escobar*, 2006 U.S. Dist. LEXIS 29735, at *15 (citing *Drayton*, 536 U.S. at 198, 205 (finding that no seizure had occurred when three officers boarded a commuter bus to search for illegal narcotics)). In light of surrounding circumstances, including the cordial tone used by Corporal Johnson, the lack of some physical touching or force or the threat of such touching or force and the lack of any display of a weapon, the Court concludes that the second encounter between Corporal Johnson and the Defendants was not a seizure, notwithstanding the presence of both Corporal Johnson and Corporal Mock.

In further support of their argument that the second encounter constituted a seizure, both Defendants argue that Corporal Johnson "did not intend to let Ms. Payton or Mr. Gooch leave . . . ." (Doc. No. 191 at 5.) However, Corporal Johnson's subjective intent is irrelevant to this analysis. See *Crandell*, 554 F.3d at 85 (explaining that, when analyzing whether a citizen-police encounter resulted in a seizure, "[t]he subjective intent underlying an officer's approach does not affect the seizure analysis."); *United States v. Hanton*, 418 F. Supp. 2d 757, 759-60, 763 (W.D. Pa. 2006) (holding that the interaction between Defendant and Trooper following the conclusion of a lawful traffic stop was consensual encounter even though, at the time the Trooper asked if he could ask Defendant a few question, the Sergeant who had subsequently arrived at location possessed an unvoiced intention to keep the vehicle parked and not let the Defendant drive it

away). Because the record is devoid of evidence of coercion or a show of authority sufficient to transform the "second" encounter into a seizure, the Court finds that once the traffic stop was completed, Corporal Johnson and the Defendants engaged in a consensual encounter during which the Fourth Amendment was not implicated, and that this consensual encounter lasted from the completion of the traffic stop to the discovery of the ecstasy tablets.[11]

## D.  Consent to Search

The Government argues that Corporal Johnson lawfully discovered the ecstasy tablets in Defendant's vehicle pursuant to Defendant Payton's valid consent to search, the scope of which included the area behind the trunk liner where the ecstasy tablets were found. (See Doc. No. 187 at 18-24.) Defendants assert that the consent to search given by Defendant Payton was invalid and, irrespective of the validity of Defendant Payton's consent, Corporal Johnson's search exceeded the scope of any consent given by Defendant Payton.[12] (See Doc. No. 150 at 28-33, 35-37.) The Court will address each of these arguments in turn.[13]

---

[11] While the Court does not base its holding on this ground, the Court finds that even assuming, *arguendo*, that the second encounter evolved from a consensual encounter to a seizure during the course of the encounter, Corporal Johnson had "reasonable, articulable suspicion of criminal activity" to warrant detaining Defendants Payton and Gooch for further investigation once Defendants answered the first initial questions about their travel plans. See *United States v. Givan*, 320 F.3d 452, 458 (3rd Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.") The factors contributing to this objectively reasonable belief include: (1) Defendant Payton's act of parking close to the white fog line (see Doc. No. 133 at 53-54), (2) Corporal Johnson's knowledge from his training that this act is a practice of drug traffickers (id. at 54-55), (3) the lack of—or small amount of—luggage in passenger compartment (see id. at 62-64), (4) the fact that Defendant Payton was travelling a long distance in the early morning hours while eight months pregnant (see 11, 23, 15, 89), (5) Corporal Johnson's knowledge that people with handicaps are often selected as drug mules (see id. at 110), (6) the nature of Defendant Payton's travel, specifically the long distance of her trip in conjunction with a nearly-immediate turn-around (see id. at 23), (7) the fact that the owner of the vehicle was not present (see id. at 19-20), and (8) Corporal Johnson's knowledge that it is common for owners of vehicles not to be present during the course of criminal activity (id. at 19). Although the facts known to Corporal Johnson can be innocently explained, "[e]ach of an officer's observations may be 'by itself readily susceptible to an innocent explanation' yet as a whole amount to a reasonable suspicion." *United States v. Walker*, 719 F. Supp. 2d 586, 599 (W.D. Pa. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[12] In her Proposed Findings of Fact and Conclusions of Law, Defendant Payton argues that her consent to search was invalid for two reasons (see Doc. No. 150 at 29-33) and that her consent to search was limited to the search of her book bag (see id. at 35). Defendant Gooch does not raise an argument regarding the validity or scope of Defendant Payton's consent in his Proposed Findings of Fact and Conclusions of Law. However, in Defendants'

## 1. Validity of Consent

Defendant Payton contends that her consent was not valid for two principle reasons. First, Defendant Payton argues that her consent was invalid because it was obtained through the use of a "ruse" allegedly perpetrated by Corporal Johnson. (See *id.* at 29-33.) Second, Defendant Payton argues that her consent was invalid because Defendant Payton's physical condition undermined the voluntariness of her consent. (See *id.* at 33.) Defendant Gooch joins Defendant Payton in this argument. (See Doc. No. 191 at 6-7.)

It is well settled that a search conducted without a warrant issued upon probable cause is "*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.*; see also *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005) (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

"[A] driver of a vehicle has the authority to consent to a search of that vehicle." *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988). When an officer relies on a suspect's consent to justify a search, the government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Price*, 558 F.3d 270,

---

Joint Reply, Defendant Gooch joins Defendant Payton in arguing that the scope of Defendant Payton's consent to search "was limited to what was requested of her" (see Doc. No. 191 at 7) and appears to join Defendant Payton's second argument regarding the voluntariness of Defendant Payton's consent to search—namely that Defendant Payton's physical condition undermined her consent (see *id.* at 6-7). Therefore, although some arguments regarding these proposed conclusion are raised solely in Defendant Payton's Proposed Findings of Fact and Conclusions of Law, because Defendant Gooch joins Defendant Payton with respect to some of these proposed conclusions, the Court will attribute the arguments found in Defendant Payton's Proposed Findings of Fact and Conclusions of Law regarding the proposed conclusions which Defendant Gooch joins to both Defendants.

[13] Defendant Payton also asserts that even if her consent is held to be valid, the evidence must be excluded because the preceding "illegal seizure tainted Payton's consent." (See Doc. No. 150 at 33-35.) However, because the Court concludes that the encounter between Defendants and Corporal Johnson following the issuance of the written warning was not an illegal detention or seizure, the Court need not address this argument.

277 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)); *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989). Whether consent to a search "was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The critical factors comprising a totality of circumstances inquiry generally include: "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." *Wilson*, 413 F.3d at 388 (quoting *Givan*, 320 F.3d at 459); see also *United States ex. rel. Harris v. Hendricks*, 423 F.2d 1096, 1099 (3rd Cir. 1970).

In support of Defendant Payton's first argument, that her consent was obtained through the use of a "ruse," Defendant Payton asserts that Corporal Johnson falsely led her to believe "that the investigation only involved a motor vehicle violation when in fact the investigation was clearly predicated on something more." (See Doc. No. 150 at 31.) This contention is directly contradicted by the audio and video evidence in this case. Immediately before requesting consent to search Defendant Payton's belongings, Corporal Johnson explained that Pennsylvania had been having problems with drugs, weapons, and large sums of money on the Pennsylvania Turnpike and asked Defendants whether there was anything "like that in the car this evening." (See Doc. No. 133 at 69, 94-95; Government Exhibit 1.) Defendant Payton therefore knew or reasonably should have known that, if granted consent to search, Corporal Johnson intended to search for guns, drugs, and money. Further, the Court finds no evidence that any of Corporal Johnson's acts or statements during the second encounter were designed to create—or reasonably could create—the impression that the investigation of Defendant Payton's belongings only involved a motor vehicle violation. Rather, Corporal Johnson clearly and specifically indicated

31

that he was looking for guns, drugs, and money. Because Corporal Johnson did not create a "ruse" or otherwise misrepresent of the nature of the government's investigation, Defendant Payton's argument that her consent is invalid as a result of a government agent's ruse or misrepresentation fails.

Alternatively, Defendant Payton, joined by Defendant Gooch, argues that her consent was invalid because of Defendant Payton's physical condition. (See Doc. No. 150 at 33; Doc. No. 191 at 6-7.) Specifically, Defendants assert that Defendant Payton's consent was not voluntarily rendered because, at the time the consent was given, Defendant was eight months pregnant and was "visibly in distress because of her need to use the bathroom." (See Doc. No. 150 at 33; Doc. No. 191 at 6-7.) Defendant argues that, in light of this condition, her ability to consent to the search "was undermined and she would have consented to anything to expedite the situation if it would have allowed her to get to a bathroom." (Doc. No. 150 at 33.) Despite the Government's contention that this proposition is "incredulous," (see Doc. No. 187 at 20) it is plausible that—under appropriate circumstances—the discomfort of having to use the restroom, coupled with other factors, may indeed provide the type of coercive environment that *United States ex. rel. Harris v. Hendricks*, 423 F.2d 1096 (3rd Cir. 1970), and its progeny caution against. However, under the facts of this case and upon consideration of the dearth of additional evidence suggesting that Defendant Payton's consent was not voluntarily given, the Court finds that Defendant Payton's pregnancy and need to use the restroom did not render her consent not voluntarily under the totality of the circumstances.[14]

The Government asserts, without citation, that at the time of the event at issue Defendant Payton was twenty-three years old, was able to read, write, understand, and speak English. (See

---

[14] Without deciding the issue, the Court reaches this conclusion even after discounting the Government's suggestion that Defendant Payton was feigning her condition during the stop, as requested in the Defendants' Joint Reply. (See Doc. No. 191 at 6-7.)

Doc. No. 187 at 18.) However, the evidence demonstrates that on March 12, 2008, Defendant Payton was of a sufficient age to possess a valid Indiana state driver's license[15] (see Doc. No. 133 at 19, 65-66) and was able to speak and understand English (see Government Exhibit 1). Defendant Payton also had at least some experience with the criminal justice system as a result of a prior arrest. (See Doc. No. 133 at 19, 66, 102-03; Government Exhibit 1.) There is no evidence that Defendant Payton suffered from mental impairment which would have impeded her ability to understand the events that were occurring or the questions asked by Corporal Johnson. By contrast, the evidence shows that Defendant Payton was able to carry on a coherent conversation with Corporal Johnson that showed no signs of diminished capacity or understanding such that Defendant Payton's ability to consent could reasonably be called into question. (See Government Exhibit 1). As explained *supra*, the setting in which Defendant Payton's consent was obtained was not the type of coercive environment that would present a risk that Defendant Payton's will was overborne. Nor was the interaction between Defendant Payton and Corporal Johnson, which lasted approximately 13 minutes and 50 seconds from the time Defendant Payton pulled the vehicle to the side of the road to the discovery of the ecstasy (see *id.*), particularly lengthy. Furthermore, during the entirety of the second (consensual) encounter, Defendant Payton spoke calmly to Corporal Johnson. (See *id.*)

Defendants correctly assert that Defendant Payton's non-verbal actions support her assertion that she needed to use a restroom during her encounter with Corporal Johnson. (See *id.*; Doc. No. 150 at 33.) These non-verbal actions—and Defendant's need to use the restroom—however, do not compel the conclusion that Defendant Payton's condition undermined her

---

[15] The minimum age for possessing an unrestricted license in Indiana is 18. See Ind. Code § 9-24-11-3(b), § 9-24-11-3.3(b); Indiana's Graduated Driver's License Law (effective July 1, 2009), http://www.in.gov/cji/files/TEEN_CARD.pdf; Bureau of Motor Vehicles, Driver's Licenses, http://www.in.gov.bmv/2363.htm (last visited December 11. 2012).

ability to consent. The evidence demonstrates that Corporal Johnson specifically asked Defendant Payton whether she was okay on multiple occasions throughout the transaction. (See Doc. No. 133 at 61, 102; Government Exhibit 1.) For example, upon observing the non-verbal actions of Defendant Payton as she stood near the trunk of the vehicle while the search was being executed, Corporal Johnson asked Defendant Payton, with convincing inflection regarding his concern for her well-being, "you okay?" (See Doc. No. 133 at 102; Government Exhibit 1.) In response to these inquires, Defendant did not indicate that she was in severe discomfort or otherwise express any desire to terminate the encounter. (See Doc. No. 133 at 21, 102; Government Exhibit 1.) Instead, Defendant merely responded that she did not need an ambulance and, later, calmly replied: "Yeah, I just gotta pee." (See Doc. No. 133 at 102; Government Exhibit 1.) Defendant Payton's response and demeanor is inconsistent with Defendants' argument that Defendant Payton was in so much pain or discomfort due to her need to use the restroom that she would have consented to anything in order to alleviate her discomfort. Defendant Payton did not request to terminate or postpone the encounter so that she could use a restroom, nor did Defendant Payton complain of her condition at any point during the second encounter prior to the discovery of the ecstasy tablets. (See Government Exhibit 1.) Rather, Defendant Payton waited patiently while Corporal Johnson asked questions and meticulously searched her book bag. (See id.)

Defendants assert no other reason, apart from Defendant Payton's pregnancy and need to use the restroom, to support their argument that Defendant Payton's consent was not voluntary and, upon review of the evidence, the Court finds no other evidence suggesting such. Because the Court finds that Defendant Payton's consent was not based on a "ruse" and that, considering the totality of the circumstances, Defendant's physical condition alone is not sufficient to render

her consent not voluntary, the Court finds that Defendant Payton's consent to search was valid. The Court next turns to the scope of the consent given by Defendant Payton.

### 2. Scope of Consent

Defendants contend that, even if Defendant Payton consented to a search, her consent was limited to Corporal Johnson's search of her book bag and did not extend to Corporal Johnson's act of bending down the trunk liner and search of that area. (See Doc. No. 150 at 35-37; Doc. No 191 at 7.) By contrast, the Government contends that Defendant Payton consented to the search of the trunk by opening the trunk without being asked prior to exiting the vehicle. (See Doc. No. 187 at 24.) The Government further calls attention to the fact that no limitations upon the search of the trunk were provided by Ms. Payton either at the time she voluntarily popped the hood of the trunk open or at the time Corporal Johnson began searching the trunk. (See Doc. No. 187 at 24.)

"When a warrantless search is authorized by voluntary consent, the extent of that search is limited to the terms of the consent." *United States v. Birt*, 120 Fed. Appx. 424, 428 (3d Cir. 2005) (citing *United States v. Kim*, 27 F.3d 947, 956 (3rd Cir. 1994) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. "The scope of a search is generally defined by its expressed object." *Id.*

Reviewing the circumstances of this case, the Court concludes that a reasonable person would have understood the exchange between Corporal Johnson and Defendant Payton to provide Corporal Johnson with consent to search Defendant Payton's book bag and not the entirety of the trunk area. The Court therefore concludes that Defendant Payton's consent

extended only to a search of her book bag and that Defendant Payton relinquished her expectation of privacy only in her book bag and the areas of the trunk that Defendant Payton willingly exposed to the public and Corporal Johnson in the course of permitting a search of her book bag.

Here, Defendant Payton informed Corporal Johnson that the only belonging or luggage-type item that she had with her was her book bag. (See Doc. No. 133 at 94-95.) In asking for Defendant Payton's consent to search, Corporal Johnson stated "Just your book bag . . . I'll tell you what, do you have any problem with me taking a quick peak and then we'll get you on your way?" (Doc. No. 133 at 69, 95, 97; Government Exhibit 1.) Because Corporal Johnson's request to search was immediately proceeded by the statement "Just your book bag . . . ," a reasonable person likely would have interpreted Corporal Johnson's next question—asking to take a quick peek inside—to extend only to that one specific item and not to some larger, unidentified area, such as the trunk or entire vehicle. While it is conceivable that a reasonable person would have understood Corporal Johnson to have asked, and Defendant Payton to have consented, to take a "quick peak" at the trunk where Defendant Payton stated her bag was located rather than at the bag itself, this understanding loses force upon Corporal Johnson's subsequent request for Defendant Payton to "step out and show me *that*" (emphasis added). Corporal Johnson's use of the demonstrative "that" implies reference to Defendant Payton's book bag; it would be both an unusual use of this demonstrative to refer to the trunk generally and an unusual understanding of Corporal Johnson's request to construe his statement to encompass this area. Indeed, in the report Corporal Johnson filled out following this incident Corporal Johnson recounted "I then asked her if she would step out and show me that, meaning the bag, and she immediately did so without objection or delay and even went as far as popping

the trunk without being asked to do so." (See Doc. No. 133 at 95-97; Defendant's Exhibit D.) While the scope of Defendant Payton's consent does not turn on Corporal Johnson's subjective understanding of the scope of Defendant Payton's consent, Corporal Johnson's understanding that he requested Defendant Payton's consent to search her bag, rather than the entirety of the trunk, provides support for the conclusion that a reasonable person would understand the exchange this way.

Having concluded that Defendant Payton did not consent to Corporal Johnson's search of the entire trunk through her cooperative responses to Corporal Johnson's request to search, the Court must decide whether Defendant Payton implicitly gave Corporal Johnson consent to search the entire trunk by popping the trunk open and failing to provide explicit limitations on Corporal Johnson's search. In circumstances of implied consent to search, the Government's burden is higher than in express consent cases. *United States v. Tarburton*, 610 F. Supp. 2d 268, 276 (D. Del. 2009) (citing *United States v. Moreland*, 437 F.3d 424, 429 (4th Cir. 2006), *overruled on other grounds by Rita v. United States*, 551 U.S. 338 (2007) *as stated in United States v. Diosdado-Star*, 630 F.3d 359 (4th Cir. 2011)); see also *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984). This Court concludes that Defendant Payton did not impliedly consent to a search of her entire trunk by remotely popping the hood of her vehicle's trunk or by failing to provide explicit limitations on Corporal Johnson's search.

In reaching this conclusion, the Court finds *United States v. Coates*, 462 Fed. Appx. 199 (3rd Cir. 2012), persuasive. In *Coates, id.*, the Third Circuit, in a non-precedential opinion, affirmed a District Court's decision denying a motion to suppress evidence of child pornography discovered on the defendant's phone pursuant to a search for certain text messages contained in the phone. The defendant was seeking a police officer's assistance in connection with

threatening text messages he had received. *Id.* at 201. When the officer asked if he should look at the text messages, the defendant said yes and handed his phone to the officer in a closed position without providing the officer any instructions on how to manipulate the phone. *Id.* at 201-03. The officer, who was unfamiliar with the model of the defendant's phone, manipulated the phone while looking at and conversing with the defendant. *Id.* at 201, 204. Upon looking down at the phone, the officer saw an image depicting child pornography, after which time the officer did not search the phone any further. *Id.* In upholding the District Court's conclusion that the defendant did not have a reasonable expectation of privacy in and consented to a search of his phone, the Court explained that, by telling the police that the text message existed and handing his phone to the officer but not navigating to the text message for the officer or instructing the officer how to reach it, "[a] reasonable person would have understood [the defendant] to have given consent to *navigate* his phone to reach the text message, which is precisely what [the officer] did." *Id.* at 203-204. Emphasizing that the officer was not paying attention to the phone while navigating through its menus, the Court went on to hold that the officer's inadvertent viewing of the pornographic image, which was in plain view when he looked at the phone, did not exceed the scope of consent. See *id.* at 204.

Here, Defendant Payton opened the trunk as a means of accessing the bag she consented to have Corporal Johnson inspect. Unlike in *Coates*, where the defendant handed his phone over to the police and permitted the officer to find the message, see *id.* at 204, here Defendant Payton did not turn custody of her trunk over to the Corporal Johnson, by, for example, handing Corporal Johnson the key to her trunk, nor did she permit Corporal Johnson to rummage through the trunk to find the item she agreed to allow him search. Instead, Defendant Payton specifically identified the object Corporal Johnson requested to see by pointing to her bag and stating "that's

my book bag . . . ." (Doc. No. 133 at 99; Government Exhibit 1.) This act eliminated the need for Corporal Johnson to navigate through the vehicle's trunk to access her book bag, as the officer in *Coates* was required to do to find the text message identified by the defendant. Further unlike *Coates*, where the contraband was in plain view as a result of the officer's reasonable navigation through the defendant's phone, see *Coates*, 462 Fed. Appx. at 204, the contraband here was not in plain view as Corporal Johnson searched Defendant Payton's book bag in the trunk of the Buick.[16] Defendant Payton's act of opening her trunk from the driver's seat and leaving it open during Corporal Johnson's search, as opposed to the alternative of opening her trunk with a key, removing her bag for Corporal Johnson, and closing the trunk, relinquished her expectation of privacy in the areas of her trunk exposed to view because "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment Protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). This area, however, did not encompass the area behind the trunk liner, which remained hidden from view. Thus, the Court concludes that Defendant Payton did not implicitly consent to a search of the entire trunk or the area behind the trunk liner.

Although the evidence does not show that Defendant Payton placed any explicit limitations on Corporal Johnson's search, the absence of explicit limitations on Corporal Johnson's search does not mean that Defendant Payton consented to a search of the entire trunk area—an area this Court has determined to be otherwise outside the scope of consent. See *Bumper*, 391 U.S. at 548 ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and

---

[16] There are three requirements for a valid seizure of evidence under the plain view doctrine: "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.' Second, the incriminating character of the evidence must be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (quoting *United states v. Menon*, 24 F.3d 550, 559-60 (3rd Cir. 1994)). Here, the ecstasy tablets were not in plain view upon Corporal Johnson's observation of the interior of the trunk of the Buick because from his location Corporal Johnson could see only the corner of the plastic bag containing the tablets, not the tablets themselves, and therefore the incriminating character of the evidence was not immediately apparent.

voluntarily given."); *Tarburton*, 610 F. Supp. 2d at, 273, 275 (finding that consent to search premises for the purpose of checking on welfare of son did not provide justification for further warrantless search after initial sweep had concluded, even where Detective stated she would be returning to the residence to "look around" and homeowners silently acquiesced). This is not a case where the consequence of Defendant's failure to delimit the scope of a search created a reasonable understanding that her consent to extended to a particular area. Unlike cases where a suspect's failure to provide explicit limitations on his consent to search certain areas or containers found within a larger space for which the suspect provided a general consent to search and this failure would lead a reasonable person to believe the suspect's general consent extended to a search of the areas or containers found within the larger space, see e.g., *Jimeno*, 500 U.S. at 251-52 (holding that the scope of suspect's consent to search included a closed paper bag found on floor of car when the suspect generally consented to a search of his car); *United States v. Hernandez*, 872 F. Supp. 1288, 1291, 1298, (D. Del. 1994) (finding that the scope of suspect's consent to search vehicle extended to containers found within the vehicle where the consent form signed by defendant authorized a "complete" search of the vehicle, defendant stated "Sure, go ahead and look" when officer requested to search the vehicle, and defendant did not delimit his oral or written consent to exclude containers; concluding that defendant's written and oral consent, viewed together, would lead a reasonable person to believe the consent extended to containers), here the verbal exchange between Corporal Johnson and Defendant Payton resulted in Defendant Payton consenting to a search of a limited area—her book bag—and not a larger area—the trunk—in which the book bag was located. Because the Court finds that a reasonable person would understand Corporal Johnson's request as a request to search Defendant Payton's book bag and that, setting aside those areas of the trunk that Defendant Payton willingly exposed

to public view, Defendant Payton's act of popping open the trunk was insufficient to imply consent to search the entire trunk, Defendant Payton's failure to place explicit limitations on Corporal Johnson's search of areas outside the scope of Defendant Payton's consent does not establish that Defendant Payton consented to a search of the entire trunk.

Therefore, in sum, the Court concludes that Defendant Payton's consent to search extended only to her book bag, which was the focus of the discussion between Corporal Johnson and Defendant Payton when consent to search was requested and granted. The Court further concludes that Corporal Johnson lawfully conducted a visual inspection of those areas of the trunk that Defendant Payton exposed by popping the hood of the trunk and leaving it open. Corporal Johnson's act of pulling down the trunk liner from the area where the ecstasy tablets were extracted, however, exceeded the scope of Defendant's Payton consent because a reasonable person would not understand the exchange between Corporal Johnson and Defendant Payton to provide consent to search the trunk as a whole, nor did Defendant Payton's act of remotely popping the trunk open give Corporal Johnson implied consent to search areas of the trunk not exposed to Corporal Johnson's view. Because Defendant Payton did not relinquish her expectation of privacy in the area behind the trunk liner, to succeed, the Government must establish that Corporal Johnson's search of the area behind the trunk liner is justified pursuant to a different legal doctrine.

E.    **The Automobile Exception as a Justification for the Search Behind the Trunk Liner of the Vehicle**

In its final attempt to justify Corporal Johnson's search of the area behind the trunk liner, the Government asserts that the "automobile exception" to the Fourth Amendment's warrant requirement applies to the contested trunk search. (See Doc. No. 187 at 24-27.) Defendants argue that the automobile exception does not apply because Corporal Johnson's search of the

41

trunk of the vehicle was not supported by probable cause. (See Doc. No. 150 at 37-38; Doc. No. 176 at 26-27; Doc. No. 191 at 7-8.)

"The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). While probable cause requires more than mere suspicion, it does not require that the officers have evidence sufficient to prove guilt beyond a reasonable doubt. *Burton*, 288 F.3d at 98 (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3rd Cir. 1995)). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Gresh v. Godshall*, 170 Fed. Appx. 217, 220 (3d Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In support of its argument that Corporal Johnson had probable cause to believe Defendants' vehicle contained contraband, the Government points to the following facts: (1) Corporal Johnson is an experienced officer trained in highway drug interdiction (Doc. No. 133 at 3-6), (2) in complying with Corporal Johnson's signal to pull off the highway, Defendant Payton parked in very close proximity to the white fog line (*id.* at 17, 52-54; Government Exhibit 1), (3) Defendant Payton began complaining of pregnancy-related cramps immediately upon Corporal Johnson's arrival at the passenger side window of the vehicle during which Defendant Gooch continued to sleep (Doc. No. 133 at 14-16; 63-64), (4) Defendant Payton was driving at approximately 3:30 a.m. while eight months pregnant (Doc. No. 133 at 15, 38), (5) Corporal Johnson observed a curious lack of luggage or indicia of travel for Defendants' stated travel plans (*id.* at 18, 64), (6) Defendant Payton ceased complaining of cramps after she was informed

she would receive a written warning and be on her way (*id.* at 16-63-64),[17] (7) Defendant Payton had a prior arrest record (*id.* at 19, 66-67, 90), (8) the car driven by Defendants was not owned by either Defendant (*id.* at 19-20), (9) Corporal Johnson was aware that the registered owner of a vehicle is seldom present during the course of criminal activity (*id.* at 19), and (10) Defendant Payton left Indianapolis, Indiana for Newark, New Jersey the previous day and was in the process of returning to Indianapolis (*id.* at 70, 94; Government Exhibit 1). (See Doc. No. 187 at 26-27.) Although not mentioned by the Government, while performing a visual inspection of the trunk area Corporal Johnson also observed that the trunk liner on the right side of the vehicle was smooth and intact but that the left inside corner of the trunk liner was loose and "had been worked," and that a small piece of plastic bag was sticking up from behind it. (See Doc. No. 133 at 22, 104.)

After a thorough review of relevant caselaw, this Court has discovered no decisions in the Third Circuit addressing a factual scenario analogous to this case. However, both the Tenth and Fifth Circuits have repeatedly held that evidence of a hidden compartment within a suspect's automobile can contribute to, and, under appropriate circumstances, may even singlehandedly establish, a finding of probable cause. See, e.g., *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1317 (10th Cir. 2006) (stating a two-part test to determine whether probable cause to search a vehicle can be based on evidence of a hidden compartment; explaining that *United States v. Jurado-Vallejo*, 380 F.3d 1235 (10th Cir. 2004), "stands for the proposition that visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search"); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006) ("It is well established that evidence of a hidden compartment can contribute to probable cause to

---

[17] Without deciding the issue, the Court reaches its conclusion even after discounting the suggestion by the Government that Defendant Payton was feigning her condition during the stop, as requested in the Defendants' Joint Reply. (See Doc. No. 191 at 6-7.)

search."); *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (same); *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997) (same; finding that evidence gas tank had been tampered with, combined with other suspicious circumstances, furnished probable cause to search the gas tank); *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994) (evidence that created a reasonable belief that vehicle contained a false compartment would create sufficient probable cause to search the vehicle); *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989) (agents' discovery of secret compartment, resulting from visual inspection of items in plain view, gave agents probable cause to search the secret compartment).

In *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1317 (10th Cir. 2006), the Tenth Circuit confronted a factual pattern similar to that of the instant case. In *Concepcion-Ledesma*, during a consensual encounter following a lawful traffic stop, the officer asked the occupants of the vehicle if he could "take a minute to look back there? Just your bag and stuff," to which the occupants responded affirmatively. *Id.* at 1311, 1315. Upon opening the back doors of the van where the occupants' bags were located, the officers noticed suspicious signs of alterations to the interior of the vehicle[18] that indicated the presence of a hidden compartment. *Id.* at 1311, 1315-16. After noting that the Government had wisely abandoned its earlier position that the occupant's consent to search her "bag and stuff" provided consent to search the entire van including areas behind the panels of the van, where contraband was ultimately discovered, the Tenth Circuit concluded that the evidence of the hidden compartment, which was plainly visible from the troopers' position in the back of the van where they were authorized to go,

---

[18] Specifically, the Trooper who opened the back doors of the vehicle testified that:
> [I]t looked like the van had been—the side walls and panels and stuff had been taken off and put back on several times, or just taken out and put back in a little jagged, because insulation—and screws and stuff were all scarred and marked up, the panels were all kind of, like they were pulled out, and you could see where the carpet and panel didn't match up, because it looked like they had been pulled away from the wall and were offset.

*United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1311 (10th Cir. 2006).

strongly suggested, and perhaps even single-handedly established, probable cause to search behind the side panels in the van. *Id.* at 1311, 1315-18. The Court further explained that any doubts as to probable cause were dispelled by the occupants' small amount of luggage for their long trip, the driver's extreme nervousness, and the driver's denial of an apparent association with other vehicles traveling nearby. *Id.* at 1318. In reaching this conclusion, the Court identified two factors upon which a determination of whether probable cause to search a vehicle can be based on evidence of a hidden compartment depends: "(1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." *Id.* at 1317 (quoting *Jurado-Vallejo*, 380 F.3d at 1238). Notably, the Tenth Circuit has found that second factor is not always a concern because "it is hard to conceive of a legitimate use for a large, hidden storage compartment in any vehicle." *Jurado-Vallejo*, 380 F.3d at 1238.

Similarly, in *United States. v. Price*, 869 F.2d 801, 804 (5th Cir. 1989), the Fifth Circuit determined that border patrol agents who conducted a visual inspection of the outside of a vehicle, which was in plain view, and thereby discovered a hidden compartment in the vehicle had probable cause to search the compartment itself. Again, in *United States v. Inocencio*, 40 F.3d 716, 719, 723-24 (5th Cir. 1994), the Fifth Circuit determined that it was reasonable to believe that a vehicle contained a false compartment where the driver of the vehicle appeared nervous, offered conflicting statements about his presence on a private road, and was driving a brand new truck with a higher-than normal-bed and fresh paint. The Court went on to hold that this belief would create sufficient probable cause to search the vehicle, even absent the voluntary consent to search given by the defendant. *Id.* at 724.

This Court finds the Tenth Circuit's reasoning in *Conception-Ledesma* and the Tenth and Fifth Circuits' analogous holdings persuasive and concludes that Corporal Johnson developed probable cause to search the area behind the trunk liner during the consensual search of Defendant Payton's book bag and the lawful visual inspection of those areas of the trunk that were plainly visible and voluntarily exposed to Corporal Johnson's (and the public's) view as he searched Defendant Payton's bag. The Court finds that Corporal Johnson's observation of the loose trunk liner and piece of plastic bag would lead a reasonable officer of Corporal Johnson's training and experience to conclude that the vehicle contained a hidden compartment. While the circumstances observed by Corporal Johnson prior to his observation of the loose trunk liner, standing alone, likely would not have persuaded a reasonable officer that there was a "fair probability" that drugs or other evidence of a crime would be found in the vehicle, the Court finds that the evidence of a hidden compartment, in conjunction with the other facts of this case—which include the suspicious nature of Defendant Payton's travel plans, Defendant Payton's act of parking close to the white fog line, the lack of luggage in the vehicle in relation to the length of Defendants' journey, and Defendant's use of a borrowed vehicle—would lead an objectively reasonable police officer to conclude that there was at least a "fair probability" that contraband would be found under the lining of Defendants' trunk. Because Corporal Johnson had probable cause to believe contraband would be found in the place to be searched, the search of the area behind the trunk liner did not violate the Fourth Amendment pursuant to the "automobile exception" and the seized contraband is admissible.

## F.     The Admissibility of Defendant Payton's Post-Arrest Statements

Defendant Payton also argues that her statements must be suppressed. (See Doc. No. 150 at 48.) At issue are two sets of statements: statements made on the scene following oral *Miranda*

warnings given by Corporal Johnson and statements made at the Pennsylvania State Police barracks after Defendant Payton was again advised of her rights and executed a written "Rights Warning and Waiver" form. (See *id.* at 46-48; Doc. No. 133 at 119; Government Exhibit 2.) Defendant Payton argues that both sets of statements must be suppressed because the *Miranda* warnings given to Defendant Payton by Corporal Johnson at the scene were inadequate. (See Doc. No. 150 at 46-48.) The Government maintains that both sets of statements are admissible. (See Doc. No. 187 at 27-30.) The Court will address the admissibility of each set of statements in turn.

### 1. Statements Made at the Scene

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989) (citing *Miranda v. Arizona*, 343 U.S. 436 (1996)). In the absence of other fully effective means adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. Unless such warnings are given and the prosecution demonstrates that the individual knowingly and intelligently waived these rights, "no evidence obtained as a result of the interrogation can be used against him." *Id.*; see *Renda v. King*, 347 F.3d 550, 557 (3rd Cir. 2003). In order to invoke *Miranda*'s exclusionary rule, however, the statement must be made during a custodial interrogation. See *Rhode Island v. Innis*, 446 U.S 291, 300-01 (1980).

It is uncontested that Defendant Payton's statements were made during a custodial interrogation. Defendant Payton's statements were made after she was in custody and in response to express questioning by Corporal Johnson. See *Innis*, 446 U.S. at 300-01 ("the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent"). (See Government Exhibit 1.) Both the Government and Defendant Payton agree that in warning Defendant Payton of her rights at the scene, Corporal Johnson stated as follows:

> My name is Corporal Robert M. [*sic*] Johnson of the Pennsylvania State Police and wish to advise you that you have an absolute right to remain silent, that anything you say can and will be used against you in a court of law, that if you wish to have an attorney present during questioning you can have one if you so desire, ok? I'm not going to make you any promises, threats or anything like that, but, uh, you know, I just gotta let you know that, you know . . . .

(See Doc. No. 28 at 9 n.10; Doc. No. 187 at 27-28; Government Exhibit 1.)

The Government correctly points out that "no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures." *California v. Prysock*, 453 U.S. 355, 359 (1981). However, in order for the statements of a suspect subject to custodial interrogation to be admissible during the prosecution's case in chief, the warnings given to the suspect must reasonably convey to the suspect his rights, whether by using the formulation of the warnings set out in *Miranda* or some fully effective equivalent. See *Duckworth*, 492 U.S. at 203 ("The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." (internal citations omitted)); *Prysock*, 435 U.S. at 359-60; *Miranda*, 384 U.S. at 476. These rights include the right to have counsel appointed if the suspect is indigent. See *Miranda*, 384 U.S. at 473. In *Miranda*, the Supreme Court explained:

> In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to

represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

*Miranda*, 384 U.S. at 473.

The problem with the *Miranda* warnings given to Defendant Payton at the scene "is not one of form or phrasing, but of substance and omission." *United States v. Street*, 472 F.3d 1298, 1312 (2006). Corporal Johnson's omission of any reference to Defendant Payton's right to have an attorney appointed for her prior to any questioning in the event that she cannot afford one and desires to have one present, a right necessary to fully "apprise a person interrogated of the extent of his rights under this system," *Miranda* 384 U.S. at 473, renders the oral *Miranda* warnings Corporal Johnson gave Defendant Payton at the scene inadequate. The statements following this oral warning must therefore be suppressed unless and until the inadequacy of the oral warnings given at the scene were sufficiently cured.[19]

### 2. Statements Made at the Pennsylvania State Police Barracks

Defendant Payton contends that her second set of statements made at the Pennsylvania State Police barracks must also be suppressed because of the *Miranda* violation that occurred. (See Doc. No. 150 at 48.) The Government argues that even if the initial set of warnings given by Corporal Johnson at the scene were insufficient, the warnings read to Defendant Payton at the Pennsylvania State Police barracks and included in the executed waiver from are sufficient,

---

[19] Because the Court concludes that the oral warnings given to Defendant Payton at the scene did not reasonably convey Defendant Payton's *Miranda* rights, the Court need not address Defendant Payton's argument regarding the voluntariness of her waiver of her *Miranda* rights with respect to the statements made following Corporal Johnson's oral warning and preceding the second *Miranda* warning given to Defendant Payton at the Pennsylvania State Police barracks. (See Doc. No. 150 at 47-48.)

thereby rendering statements made following the second administration of Defendant's *Miranda* warnings and Defendant's execution of the written waiver admissible. (See Doc. No 187 at 30.)

Where a suspect is properly *Mirandized* and makes one or more incriminating statements only after making similar unwarned statements[20] the admissibility of the suspect's postwarning[21] statements are governed by the Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298 (1985) and the Supreme Court's plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004), as narrowed by Justice Kennedy, see *United States v. Kiam*, 432 F.3d 524, 531-32 (3d. Cir. 2006)); *United States v. Naranjo*, 426 F.3d 221 (3d Cir. 2005). See *Kiam*, 423 F.3d at 531-33 (clarifying the proper analysis for admissibility of warned statements made after improperly unwarned statements). In making her argument, Defendant Payton appears to seek suppression of the second set of statements on the ground that the shortcomings of the oral *Miranda* warnings and/or the factors that allegedly rendered Defendant Payton's initial on-the-scene waiver of her rights invalid also render Defendant Payton's subsequent statements inadmissible.[22] Unfortunately, the contours of Defendant Payton's argument are not clear. Nor is the factual record sufficient to decide whether the second set of statements is admissible. As further stated

---

[20] Finding no Third Circuit precedent on this issue, this Court follows the assumption of the Eleventh Circuit that *Seibert* applies not only to cases where no *Miranda* warnings were given but also to cases where incomplete or defective *Miranda* warnings were given. See *United States v. Street*, 472 F.3d 1298, 1312, 1314 (11th Cir. 2006).

[21] The Court uses the term "postwarning statements" to refer to those statements made by the suspect after she was properly informed of her Fifth Amendment Rights. Defendant Payton does not contend that there was any deficiency in the *Miranda* warnings given to her at the Pennsylvania State Police barracks.

[22] In her Proposed Findings of Fact and Conclusions of Law, Defendant Payton specifically argues that "Payton's subsequent statements to the police after she was advised of her *Miranda* rights by Trooper Brautigam and Trooper Volk . . . must also be suppressed because of the Miranda violation that occurred here." (Doc. No. 150 at 48.) Although the Court agrees that the first set of statements made by Defendant Payton must be suppressed because the oral *Miranda* warnings given to Defendant Payton were insufficient, technically no *Miranda* violation occurred because no unwarned—or in this case, insufficiently warned—statements have been admitted into evidence at trial. See *United States v. Patane*, 542 U.S. 630, 636, 641-42 (2004) (quoting *Chavez v. Martinez*, 538 U.S. 760 (2003) (plurality opinion)) (explaining that the right against self-incrimination is a trial right and *Miranda* warnings are prophylactic, and therefore "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation.").

in the accompanying Order, the Court will afford Defendant Payton an opportunity to define this argument and develop the record at a supplemental suppression hearing. Following this hearing, Defendant Payton shall file a supplemental Proposed Findings of Fact and Conclusions of Law using the framework set out by the Supreme Court in *Seibert*, as narrowed by Justice Kennedy, see *Kiam* 423 F.3d at 531-33, and *Elstad*. The Government will be provided with an opportunity to respond.

Therefore, as stated in the accompanying Order, the Court grants Defendant Payton's Motion to Suppress the statements made by Defendant Payton following the oral *Miranda* warnings given at the scene by Corporal Johnson up until the time Defendant Payton was again warned of her *Miranda* rights at the Pennsylvania State Police barracks. The Court will defer ruling on the admissibility of the statements made by Defendant Payton following the *Miranda* warnings given at the Pennsylvania State Police barracks until after the matter is addressed at the supplemental suppression hearing and through the parties' supplemental Proposed Findings of Facts and Conclusions of Law.

### G.    The Admissibility of Evidence Acquired Pursuant to the Search Warrant(s)

Lastly, Defendant Payton argues that all evidence obtained from Defendant Payton's cell phone as a result of the execution of the search warrant(s) must be suppressed because "a warrant obtained after an illegal search and seizure is invalid if it is based upon the facts obtained in the illegal entry or if it would not have been sought or obtained hat it not been for the illegal entry." (See Doc. No. 150 at 49.) In light of the Court's finding that the search of the Buick was lawful, this argument is without merit.

### V.    CONCLUSION

For the above-stated reasons, the Court will **GRANT in part** and **DENY in part** Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence (Doc. No. 28) and will **DENY** Defendant Charles J. Gooch, Jr.'s Motion to Suppress Evidence (Doc. No. 110). An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:08-cr-07 |
| | ) | |
| CHARLES J. GOOCH, JR. and | ) | JUDGE KIM R. GIBSON |
| STERLING YAZMIN LONG-PAYTON, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this **28ᵗʰ** day of December 2012, upon consideration of Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence Obtained as a Result of an Unlawful Search and Seizure with Accompanying Citation of Authority (hereinafter Defendant Payton's "Motion to Suppress Evidence") (Doc. No. 28) and Defendant Charles J. Gooch, Jr.'s Motion to Suppress Evidence (Doc. No. 110), and in accordance with the foregoing Opinion, **it is HEREBY ORDERED** as follows:

1. Defendant Charles J. Gooch, Jr.'s Motion to Suppress Evidence (Doc. No. 110) is **DENIED**.

2. Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence (Doc. No. 28) is **GRANTED in part** and **DENIED in part**. Specifically:

   a. Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence (Doc. No. 28) is **GRANTED to the extent that** its seeks to suppress statements made by Defendant Payton following the oral *Miranda* warning given by Corporal Johnson at the scene and before the second *Miranda* warning given by Trooper Brautigam at the Pennsylvania State Police barracks.

b. Defendant Sterling Yazmin Long-Payton and the Government are **ordered to appear** for a supplemental suppression hearing **on January 17, 2013 at 1:00 p.m.** in Courtroom A, 319 Washington Street, Johnstown, PA 15901, regarding the admissibility of statements made by Defendant Payton following the second administration of Defendant Payton's *Miranda* rights at the Pennsylvania State Police barracks and the execution of the written waiver of these rights by Defendant Payton.

c. Following the Supplemental Suppression Hearing, Defendant Sterling Yazmin Long-Payton and the Government are **ordered to file** supplemental Proposed Findings of Facts and Conclusions of Law regarding the admissibility of statements made by Defendant Payton following the second administration of Defendant Payton's *Miranda* rights at the Pennsylvania State Police barracks and the execution of the written waiver of these rights by Defendant Payton. A schedule for submission of these filings will be established following the Supplemental Suppression Hearing.

d. Defendant Sterling Yazmin Long-Payton's Motion to Suppress Evidence (Doc. No. 28) is **DENIED in all other respects.**

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**